UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

JENNIFER MAIN,                      )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        No. 1:23-cv-00186-TRM-SKL
                                    )
COMMISSIONER OF SOCIAL SECURITY,    )
                                    )
        Defendant.                  )

## REPORT AND RECOMMENDATION

Plaintiff Jennifer Main brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") terminating

Plaintiff's benefits. Each party has filed a brief seeking judgment in their favor pursuant to Rule

5 of the Federal Rules of Civil Procedure Supplemental Rules for Social Security [Doc. 15, Doc.

16, & Doc. 18].[1] Plaintiff also filed a reply brief pursuant to Rule 8 of the Supplemental Rules

[Doc. 23]. For the reasons stated below, I recommend: (1) Plaintiff's request for relief be denied,

and (2) the Commissioner's request for affirmance of his decision terminating benefits be granted.

## I.    ADMINISTRATIVE PROCEEDINGS

According to the administrative record [Doc. 5 ("Tr.")], Plaintiff was awarded disability

insurance benefits ("DIB") and supplemental security income ("SSI") on December 4, 2009, for

her disability beginning November 4, 2007. ALJ Richard Gordon determined Plaintiff's

fibromyalgia and depression caused functional limitations that precluded all work activity (Tr. 67).

---

[1] Plaintiff's filings are styled as a motion for judgment on the pleadings with a supporting
memorandum, consistent with the practice prior to the effective date of the new Supplemental
Rules. The Commissioner's brief is likewise styled as a response to the motion.

Her disability was found to be ongoing in a continuing disability review conducted June 27, 2014. A second continuing disability review was conducted in late 2019. On November 8, 2019, Plaintiff was notified that the Social Security Administration ("SSA") determined her medical condition had improved since June 27, 2014, such that she would no longer be considered disabled as of November 30, 2019, and she would stop receiving benefits in two months.

Plaintiff appealed that unfavorable determination, and a new ALJ—ALJ Suhirjahaan Morehead—conducted an administrative hearing on August 10, 2022. Plaintiff was represented by a non-attorney representative[2] at the administrative hearing. On September 13, 2022, ALJ Morehead[3] issued a decision affirming the cessation of Plaintiff's benefits. Specifically, the ALJ found that as of November 30, 2019, Plaintiff's medical condition and functional capacity had improved to the point that she no longer qualified as disabled under the Social Security Act. The ALJ relied on a comparison point decision ("CPD") of June 27, 2014, the date of Plaintiff's most recent successful continuing disability review. The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed the instant action.

## II.    FACTUAL BACKGROUND

### A.    Education and Employment Background

Plaintiff was born on September 26, 1982, making her 37 years old on November 30, 2019 (Tr. 23). This is considered a "younger individual." 20 C.F.R. § 404.1563(c). She has at least a

---

[2] The representative was and remains associated with the law firm representing Plaintiff in this appeal [Doc. 16 at Page ID # 1069].

[3] All remaining references to the "ALJ" are to ALJ Morehead, unless otherwise specified.

high school education and is able to communicate in English. She has past relevant work as a cash handler, salesclerk, administrator, call center representative, and customer service representative (Tr. 23). All of these occupations are classified in the Dictionary of Occupational Titles ("DOT") as either light or sedentary, and they have specific vocational preparation levels ranging between two and seven.

### B.     Medical Records

In her 2022 decision, ALJ Morehead noted that, at the time of the CPD (June 2014), Plaintiff had severe, medically determinable impairments consisting of fibromyalgia, depression, and migraines (Tr. 12). In a brief filed by her attorney in December 2022, Plaintiff alleged "impairments of chronic fatigue, post-traumatic stress disorder, depression, anxiety, panic attacks, pancreatitis, ADHD, IBS, fibromyalgia, migraines, neck pain, back pain, and narcolepsy." (Tr. 391). There is no need to summarize all of the medical records but the relevant records have been reviewed.

### C.     Hearing Testimony

At the hearing held August 10, 2022, Plaintiff and a vocational expert ("VE") testified. As noted, Plaintiff was represented by a non-attorney representative at the hearing. The transcript of the hearing has been carefully reviewed.

## III.     APPLICABLE LAW AND THE ALJ'S FINDINGS

### A.     Applicable Law

A person's continued entitlement to DIB must be reviewed periodically. 20 C.F.R. § 404.1594(a). Benefits may be terminated upon the Commissioner's finding that "there has been any medical improvement in the individual's impairment or combination of impairments . . . related to the individual's ability to work . . . and . . . the individual is now able to engage in

3

substantial gainful activity."  42 U.S.C. § 423(f)(1).[4]  It is well established that there is no presumption of continued disability.  42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(b)(6); *see also Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007) (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286-87 n.1 (6th Cir. 1994)).  ALJs use an eight-step process to determine whether a DIB recipient continues to be entitled to benefits.  The first two steps require the ALJ to determine whether a claimant is currently engaging in substantial gainful activity and if not, whether the claimant has an impairment or combination of impairments that meets one of the listings.  20 C.F.R. § 404.1594(f)(1)-(2).  If not, then at step three, the ALJ must determine whether there has been a "medical improvement."  *Id.* § 404.1594(f)(3).

"Medical improvement" is defined as:

> any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled.  A determination that there has been a decrease in medical severity must be based on improvements in the symptoms, signs and/or laboratory findings associated with your impairment(s).

*Id.* § 404.1594(b)(1).

To determine whether the claimant's impairments have "improved," the ALJ uses the CPD, which is defined as "the most recent favorable medical decision that you were disabled or continued to be disabled," as a reference point.  *Id.* § 404.1594(b)(7).  If at the time of the disability review, a claimant's impairments are less severe than they were at the CPD, then a medical improvement has occurred, and the ALJ must proceed to step four and determine whether the improvement is related to the claimant's ability to work.  *Id.* § 404.1594(f)(4).  This requires the

---

[4] There are exceptions to the medical improvement requirement, for example if a person receives new education or training that improves their ability to perform a wider range of jobs, but these are not applicable in this case.  *See* 20 C.F.R. § 404.1594(d), (e).

4

ALJ to assess the claimant's current residual functional capacity ("RFC") and compare it to her RFC at the time of the CPD. Step five requires the ALJ to consider whether an exception applies. *Id.* § 404.1594(f)(5).

If medical improvement related to a claimant's ability to work has occurred, the Commissioner still must generally show the claimant is "currently able to engage in substantial gainful activity before [the SSA] can find that [the claimant] is no longer disabled." *Id.* § 404.1594(a). Accordingly, if the claimant's ability to work has increased due to her medical improvement, the ALJ proceeds to step six and determines whether the recipient's current impairments are "severe," or in other words, whether they "significantly" affect her ability to perform work. *Id.* § 404.1594(f)(6). If they are not severe, the recipient's disability has ended. *Id.* If they are severe, at step seven the ALJ asks whether the recipient can still perform work she has done in the past or, failing that, other work (step eight). *Id.* § 404.1594(f)(7)-(8). At this step, "the implementing regulations incorporate many of the standards set forth in regulations governing initial disability determinations." *Kennedy*, 247 F. App'x at 765 (citing 20 C.F.R. § 404.1594(b)(5), (f)(7)). "The difference, of course, is that the ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy*, 247 F. App'x at 765 (citing 20 C.F.R. § 404.1594(b); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)).

### B. The ALJ's Findings

The ALJ identified the CPD as June 27, 2014 (Plaintiff's most recent favorable determination) and determined Plaintiff had not engaged in substantial gainful activity at any relevant time. The ALJ found at the time of the CPD in June 2014, Plaintiff's medically determinable impairments consisted of fibromyalgia, migraines, and depression. At steps three and four, the ALJ found medical improvement occurred regarding these impairments by November

5

30, 2019, and that the medical improvement resulted in an increase in Plaintiff's RFC. Therefore, the medical improvement related to the ability to do work. Specifically, the ALJ found:

> Since November 30, 2019, the impairments present at the time of the CPD decreased in medical severity to the point where the claimant has had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: understand simple and detailed but not complex instructions; no contact with the public, occasional contact with coworkers and supervisors; no production rate pace work such as work on an assembly line or hourly quota; and occasional changes in routine and work setting.

(Tr. 14).

Next, the ALJ found that as of November 30, 2019, Plaintiff had the following severe, medically determinable impairments: fibromyalgia, depression, chronic fatigue syndrome, pancreatitis, PTSD, depression, and anxiety. The ALJ did not include migraines (one of Plaintiff's medically determinable impairments at the June 2014 CPD). At step six, the ALJ found none of these impairments met or equaled the requirements of any listed impairment, either singly or when considered in combination with one another (Tr. 12-14).

Considering all these impairments, the ALJ then assessed an RFC with the same mental restrictions and light exertional level abilities as quoted above, with additional restrictions for no climbing ladders, ropes, or scaffolds; and no working around hazards such as unprotected heights or moving machinery (Tr. 16).

At step seven, applying this updated RFC, the ALJ found Plaintiff was unable to perform any of her past relevant work. At step eight, however, the ALJ found there were occupations with jobs existing in substantial numbers in the national economy that a person with this RFC could perform, including merchandise marker, office helper, and office router (Tr. 24). These findings

6

led to the ALJ's determination that Plaintiff's disability ended as of November 30, 2019, which resulted in the termination of Plaintiff's benefits.

## IV.    ANALYSIS

Plaintiff argues the ALJ's decision to terminate her benefits should be reversed and this case remanded for an award of benefits, or in the alternative, for further administrative proceedings. She raises the following issues:

1.    The ALJ erred in not giving enough weight to the Plaintiff's treating physician.

2.    The ALJ erred by finding the Plaintiff is able to do any work on a regular sustained basis and the decision is not based on substantial evidence.

3.    The ALJ erred in deciding the Plaintiff had a medical improvement which occurred on November 19, 2019.[5]

[Doc. 16 at Page ID # 1084, 1085, & 1090].

I will address the medical improvement issue first, then the treating physician issue, and last, the more general arguments Plaintiff raises in her second "issue," quoted above.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citations omitted). The United States Supreme Court recently explained that "'substantial evidence' is a 'term of art,'" and "whatever the meaning of 'substantial' in other settings, the threshold for such evidentiary sufficiency is not high." *Biestek*

---

[5] The ALJ refers to November 30, 2019, as the date of Plaintiff's medical improvement, rather than November 19. Presumably this is because benefits checks are issued monthly and Plaintiff received benefits for two more months before her payments stopped in January 2020 (Tr. 100).

7

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). Rather, substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also McClanahan*, 474 F.3d at 833. Furthermore, the evidence must be "substantial" in light of the record as a whole, "taking into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (citations omitted).

If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) (citations omitted); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971) (citation omitted). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No.

8

1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claims of error without further argument or authority may be considered waived).

### B.    Medical Improvement

Plaintiff argues the ALJ's determination that Plaintiff experienced medical improvement by November 30, 2019, "is completely unwarranted." [Doc. 16 at Page ID # 1092]. According to Plaintiff, she has "deteriorated both physically and mentally" since the June 2014 CPD [*id.*].

As mentioned, ALJ Gordon found Plaintiff qualified as disabled beginning November 4, 2007, based on severe medically-determinable impairments of fibromyalgia and depression, and a resulting physical RFC of less than sedentary, which would preclude all work (Tr. 77). The decision does not reflect any specific mental RFC limitations, and ALJ Gordon found only mild or "mild-to-moderate" restrictions in the "broad areas of functioning . . . for evaluating mental disorders" (Tr. 69). Regarding Plaintiff's physical functioning, ALJ Gordon found:

> Evaluation of the medical evidence shows the claimant has a history of treatment for complaints of chronic pain, stiffness and swelling in multiple joints. The record shows the claimant was hospitalized in August 2006, for fever and chills. Laboratory testing was positive for Lyme disease. The claimant was treated and her condition apparently improved. However, she eventually sought ongoing treatment with Richard Pak, M.D., a primary care physician, for complaints of headaches, nausea, vomiting, memory loss, and extreme fatigue. Dr. Pak prescribed non-steroidal anti-inflammatory medication. He noted repeat laboratory tests were positive for Lyme disease in November 2007. These symptoms progressed and she began to complain of generalized weakness, inability to concentrate, generalized arthralgias and worsening headaches.
>
> The claimant was referred to numerous physicians who diagnosed Lyme disease, borreliosis, and neurotransmitter hormone disorder. She was treated with oral antibiotics and anti-yeast medication; however, she reported no improvement. In fact, the

9

claimant required hospitalization on several occasions for treatment of intractable nausea and vomiting causing dehydration, requiring treatment of intravenous rehydration and intravenous antibiotic therapy. Dr. Pak eventually diagnosed the claimant with chronic fatigue syndrome. She has been treated with muscle relaxants, inflammatories and physical therapy; however, minimal improvement has been reported.

. . . .

Dr. Griffin, the medical expert, reviewed the medical record before the hearing. He testified that after his evaluation of the medical evidence, he feels the claimant has been misdiagnosed. He stated the claimant has been to numerous physicians receiving extensive evaluations and treatment. He stated the claimant has been diagnosed with Rocky Mountain spotted fever, Lyme disease, borreliosis, and neurotransmitter hormone disorder; however, he opined her symptoms are more consistent with fibromyalgia.

. . . .

The State agency medical consultant's physical assessments are given little weight because another medical opinion is more consistent with the record as a whole. Indeed, Dr. Pak, the claimant's primary care physician, restricted the claimant to less than a sedentary level of activity. I give greater weight to the claimant's treating physician who has a history of treating the claimant on a longitudinal basis (SSR 96-2p).

(Tr. 68-69).

The notice of continuing benefits from the June 2014 CPD indicates Plaintiff's primary diagnosis (at that time) was fibromyalgia and her secondary diagnosis was migraine headaches (Tr. 72). In the accompanying June 2014 DDS[6] Medical Consultant Analysis, Dr. Iris Rotker found no significant medical improvement had occurred since ALJ Gordon's December 2009 decision (Tr. 659). Dr. Rotker cited records indicating frequent headaches, sometimes lasting as long as three to four days (Tr. 659). He also noted emergency room visits prompted by migraine headaches in May and October 2013, plus additional hospital visits during which Plaintiff reported

---

[6] Disability Determination Services

10

headaches or migraines in addition to other conditions (Tr. 659). He mentioned a 2013 cervical spine surgery—the record reflects this area of Plaintiff's spine was "stable" at least as late as January 2020 (Tr. 1009; Tr. 659). Dr. Rotker concluded his case evaluation by finding Plaintiff "has FMS w chronic pain and chronic severe migraines, treated in ER, and by TP."[7]

Fast forward to September 2022. ALJ Morehead considered the impairments observed by ALJ Gordon and Dr. Rotker, and found that by November 30, 2019, Plaintiff had experienced medical improvement in these impairments which improved her RFC from a less than sedentary level, to a light exertional level with no postural limitations, but with significant mental limitations. ALJ Morehead explained:

> In making this residual functional capacity assessment, I did not consider the limiting effects of the impairments that developed after the CPD. . . . [T]he medical record shows that the claimant presented to the Emergency Room in 2013 and 2014 with complaints of migraine headaches. These records also contain a CT of her brain from May of 2013, which was unremarkable. The claimant also left prior to formal discharge on this occasion (Exhibit B2F, pgs. 5, and 11). An MRI of her brain was then taken in July of 2013, and it was also noted to be normal (Exhibit B4F, pg. 51). These records also contain a CT of her abdomen taken in April of 2014, which showed no evidence of acute abnormality (Exhibit B3F, pg. 2). The claimant also presented to Dr. Salt in 2013 through May of 2014 primarily for medication management. I note that exams from these visits were overall normal (Exhibit B4F, pgs. 1-20). The medical record also shows that in 2018 and 2019, the claimant presented to Memorial Primary Care. I do note that at a visit in July of 2019, the claimant reported that she was concerned about depression (Exhibit B12F, pg. 11). These records show that on limited occasions the claimant is noted to appear chronically ill, which appears to be primarily due to a new impairment that developed after the CPD. Exams from these visits routinely show the claimant to be well-developed and nourished, in no acute distress with normal respiratory findings, normal cardiovascular findings, normal gait and station, normal range of motion, appropriate judgment and insight, intact mental status, clear thought and speech, fully oriented,

---

[7] FMS = fibromyalgia syndrome; TP = treating physician.

11

intact memory, and an appropriate mood and affect (Exhibits B6F, pgs. 2, 4, 6, and 8; B8F, pgs. 4, 10, 11, 15, 21, 25, 29, 35, 39, 43, 49, 52, 53, 57, and 58; B9F, pgs. 4, and 8; and B12F, pgs. 4, 9, 14, and 22). Therefore, the record clearly shows medical improvement related to the claimant's depression, fibromyalgia, and migraines.

(Tr. 14-15).

Preliminarily, it appears Plaintiff's mental impairments and any related mental functioning limitations are not relevant to the question of whether Plaintiff experienced medical improvement. ALJ Gordon's December 2009 favorable decision does not specifically assign any mental limitations, and it reflects only mild or mild-to-moderate findings regarding Plaintiff's mental functioning (Tr. 69). A Psychiatric Review Technique performed by Rebecca Staab, EdD, on January 17, 2020, confirms the December 2009 award was based on Plaintiff's physical condition (Tr. 925). Dr. Rotke's June 2014 DDS Medical Consultant Analysis, which continued Plaintiff's benefits, likewise does not address mental limitations (Tr. 656-60). By contrast, ALJ Morehead found that, as of November 2019, Plaintiff had moderate restrictions in all areas of mental functioning, and ALJ Morehead included mental functioning limitations in Plaintiff's RFC (Tr. 13, 14, and 16).

As a result, and despite the references to depression in the medical improvement analysis, I interpret the ALJ's decision as indicating medical improvement in Plaintiff's **physical** conditions which led to an overall increased RFC. Accordingly, Plaintiff's medical improvement arguments which relate to her mental functioning should be overruled.[8]

Regarding medical improvement of her physical condition/abilities, Plaintiff cites to the Physical RFC Assessment completed on January 17, 2020, by Ronald Addlestone, M.D. (Tr. 927-

---

[8] Plaintiff's arguments concerning the ALJ's assessment of her mental functioning limitations are addressed further, below.

37). Plaintiff argues Dr. Addlestone "indicated the Plaintiff had far less residual functional capacity than opined by the ALJ" [Doc. 16 at Page ID # 1090]. Plaintiff's argument is misplaced and mistaken. For one, Dr. Addlestone's assessment is consistent with the ALJ's assessment of light work. The only difference appears to be that Dr. Addlestone assessed a limitation for only occasional reaching overhead and climbing ladders/ropes/scaffolds (Tr. 929). Accordingly, Dr. Addlestone's assessment plainly indicates improved physical functioning from the June 2014 CPD.

Plaintiff also cites to an opinion offered by one of her treating physicians, David Castrilli, M.D., on April 23, 2021 (Tr. 1026-27). Dr. Castrilli opined Plaintiff experienced severe pain and fatigue, had problems with stamina, would require at least 30 minutes of bed rest during a normal workday, would be absent at least two days per month due to her conditions or treatment, and could not be relied upon to regularly attend work (Tr. 1026). He indicated Plaintiff's medications would "reasonably cause lapses in concentration or focus" (Tr. 1026).

The medical improvement comparison analysis focuses on changes to a person's functioning based on the impairments present at the CPD. *See Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 294 (6th Cir. 2006) (affirming termination of benefits, noting that depression and respiratory problems "were not part of" earlier disability determinations, and therefore did "not alter" the review of the disability cessation determination); *Booms v. Comm'r of Soc. Sec.*, 277 F.2d 739, 744 (6th Cir. 2003) ("Once it is accepted that the plaintiff was disabled prior to January 2, 1998, the issue in this case becomes whether the plaintiff's physical impairments that resulted in the disability finding dissipated . . . ."). There is no indication Dr. Castrilli's opinion relates to the effects of the impairments Plaintiff had at the CPD (migraines, depression, and fibromyalgia). Indeed, treatment records from Dr. Castrilli's office dated just two days before the opinion reflect

13

a focus on Plaintiff's pancreatitis-related issues (Tr. 983-86), which as the ALJ notes, developed after the CPD (Tr. 15). Even if one considers the digestive issues and abdominal pain Plaintiff experienced from 2007 through 2014 to be linked to her later pancreatitis (which Plaintiff has not argued), the record reflects Plaintiff's weight had stabilized by November 2019 and her pancreatitis-related issues continued to improve thereafter (Tr. 876, Tr. 974, Tr. 1019, Tr. 1009). It is also worth mentioning the ALJ assigned "little weight" to Dr. Castrilli's opinion (Tr. 21), meanwhile assigning "significant weight" to the opinion of the DDS medical consultants, including the January 2020 Physical RFC Assessment by Dr. Addlestone, which made comparisons to Plaintiff's past impairments and limitations (Tr. 927-36).

I note Plaintiff was also diagnosed and treated for various other digestion-related ailments in 2013 and 2014, including acute colitis and fecal stasis (Tr. 659). Plaintiff received treatment for the colitis and possibly for the fecal stasis in 2014 before the lengthy gap in treatment began (Tr. 659), and the more recent records do not indicate these problems persisted into or beyond November 2019, as far as I can tell.

Plaintiff cites *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 377 (6th Cir. 2013) in support of her argument regarding medical improvement. In that case, the district court affirmed the ALJ's denial of benefits and the Sixth Circuit reversed and remanded the case for further administrative proceedings. The Sixth Circuit found the ALJ failed to properly consider the opinion of the claimant's treating physician. In particular, the court found the ALJ placed undue emphasis on the claimant's activities of daily living and erred in discounting the treating physician's opinion based on those activities. *See id.* at 377-78 ("These activities would be relevant if they suggested that Gayheart could do something on a sustained basis that is inconsistent with Dr. Onady's opinions. But they do not. Furthermore, many of these examples are either

14

taken out of context or are offset by other examples in the record."). Plaintiff does not explain the significance of *Gayheart* – a denial of benefits case (not termination) concerning the now-defunct treating physician rule – to her medical improvement argument. Accordingly, I will not address *Gayheart* any further as it allegedly pertains to medical improvement. *See McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019) ("A party may not present a skeletal argument, leaving the court to put flesh on its bones.").

In her reply, Plaintiff argues "[i]f she has had some form of an improvement from [her] impairments, this was due to taking high dose narcotic pain medication." [Doc. 23 at Page ID # 1141]. She does not address the nearly four-year-long gap in her medical record prior to 2019, during which time she apparently did not receive any treatment for her impairments. It is undisputed she experienced significant symptoms in 2019 related to pancreatitis, but as discussed throughout this report, the record reflects her pancreatitis-related symptoms were stabilized by November 2019 and continued to improve thereafter, and Plaintiff was eventually able to wean herself from pain medication.

Perhaps the ALJ could have done a more thorough job explaining specifically how Plaintiff's physical functioning improved from the CPD in June 2014 to the point that she was capable of a reduced range of light work by the November 2019 disability cessation date. However, for the reasons set forth above, I find there is substantial support in the record for the ALJ's determination that Plaintiff experienced improvement in her physical functioning abilities, and I conclude the Commissioner has met his burden in this regard. I also find the ALJ applied the correct legal standards in making this determination. Accordingly, Plaintiff's request for relief should be denied to the extent it is based on a lack of medical improvement between the CPD in June 2014 to the disability cessation date in November 2019.

15

## C. Treating Physician

Plaintiff argues the ALJ also erred in her consideration of Dr. Castrilli's April 2021 opinion.[9]  Regarding this opinion, the ALJ found:

> The record also contains a medical statement from Dr. David Castrilli, M.D. (Exhibit B22F).  Dr. Castrilli states that the claimant requires extra breaks and a 30-minute bed rest during a normal workday.  He also states that the claimant's pain, fatigue, medical condition, or medication would cause the claimant to be off task 10% or more of any given day, she would have lapses in concentration, and she would be absent from work 2 or more days during any given month.  I have given Dr. Castrilli's statement little weight noting that his findings are not consistent with the overall medical record in this case.  For example, the record shows that her weight has stabilized and she reports that her GI issues are overall well controlled, with only some intermittent vomiting/nausea depending on what she eats.  The record also contains physical exams that routinely show her to be well-developed and nourished, in no acute distress, fully oriented with normal pulmonary findings, normal cardiovascular findings, normal lymphatic findings, normal gait and station, normal extremities, and normal muscle strength and tone.  Furthermore, the record shows that the claimant's reported narcolepsy is actually overall controlled with medication.

(Tr. 21 (internal citations omitted)).

Under 20 C.F.R. § 404.1520c, an ALJ is required to consider multiple factors in evaluating medical opinion evidence, including (1) supportability, (2) consistency, (3) a source's relationship with the claimant, (4) specialization, and (5) other supporting or contradicting factors.  This rule

---

[9] Although Plaintiff's initial application for benefits was filed prior to the regulatory changes which eliminated the treating physician rule, *see* 20 C.F.R. § 404.1520c, Plaintiff applies the updated rules in her opening brief and in her reply.  Accordingly, Plaintiff has waived any argument in support of application of the treating physician rule. *See Howington*, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived); *Woods*, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009) (conclusory claims of error without further argument or authority may be considered waived).  Regardless, I find Plaintiff has not shown any reversible error in the ALJ's consideration of the opinion evidence under either the treating physician rule or the updated rules.

16

"notably reduces the articulation standards required for ALJs in assessing medical source opinions." *Gourley v. Comm'r of Soc. Sec.*, No. 2:21-CV-99, 2022 WL 4546376, at *5 (E.D. Tenn. Sept. 28, 2022) (cleaned up and citation omitted). "Supportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate." *Jones v. Berryhill*, 392 F. Supp. 3d 831, 839 (M.D. Tenn. 2019) (citation omitted). While the ALJ is required to consider the relevant factors, the ALJ is not required to explain their consideration in the written decision. 20 C.F.R. § 404.1520c(b)(2).

Regarding supportability, the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. § 1520c(c)(1). Regarding consistency, the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. § 1520c(c)(2).

If a source offers multiple opinions, the ALJ is not required to articulate their assessment of every single medical opinion; rather, they can articulate how they considered all of that source's opinions "in a single analysis." *Id*. § 1520c(b)(1).

Plaintiff argues the "ALJ's analysis is inconsistent with the medical facts," because "multiple visits with Dr. Castrilli indicate the Plaintiff's inability to maintain weight and showed she had lost over fifty pounds in two years due to her stomach issues." [Doc. 16 at Page ID # 1085]. Plaintiff cites to records from appointments with Dr. Castrilli on May 9, 2019 (Tr. 753 & Tr. 823), and April 25, 2019 (Tr. 760). However, the ALJ explicitly acknowledged Plaintiff lost over 60 pounds between late 2018 and June 2019, and further that Dr. Castrilli treated Plaintiff for serious

17

gastrointestinal issues beginning in November/December 2018 (Tr. 18, Tr. 22). The ALJ then described how Plaintiff's weight began to stabilize by July 2019 (Tr. 18), and she started gaining weight. By November 26, 2019, Plaintiff weighed 133 pounds (Tr. 1022, Tr. 18). This timeline supports the ALJ's decision that Plaintiff no longer qualified as disabled as of the end of November 2019, particularly when the records in the years following are considered. Plaintiff was still "gaining weight" and experiencing "progressive[] improvement" in her ability to tolerate more foods in January 2020 (Tr. 1009). And notes from a June 29, 2022, appointment with Dr. Castrilli state that while Plaintiff still "has some discomfort with eating at times," she nevertheless "weaned herself off of pain medication and is now tolerating regular diet" with only "occasional nausea and vomiting spells." (Tr. 977). She was up to 152 pounds by that time (Tr. 980). This appointment occurred more than one year after Dr. Castrilli offered his medical opinion (Tr. 977, Tr. 1027). Accordingly, contrary to Plaintiff's argument, the "medical facts" support the ALJ's assessment of Dr. Castrilli's opinion as it pertains to the post-November 2019 period.

Plaintiff also suggests the ALJ erred by assigning "significant weight" to the opinions of the DDS medical consultants versus "little weight" to Dr. Castrilli's (Tr. 19). Plaintiff speculates that, "[h]ad those physicians' visits been in person and over the course of several years, it is likely their opinions would have been consistent with the opinions of Dr. Castrilli." [Doc. 16 at Page ID # 1085]. I note the ALJ was clearly aware of and considered Plaintiff's long-term treating relationship with Dr. Castrilli as compared to the non-examining role played by the DDS medical consultants [*see* Tr. 19 ("As for the opinion evidence, the [DDS] medical consultants reviewed the record and accorded an RFC . . . .")]; *see also Leslie B. v. O'Malley*, No. 1:22-CV-00175-HBB, 2024 WL 130165, at *5 (W.D. Ky. Jan. 11, 2024) (ALJ's consideration of DDS consultants' opinion evidence supported in part because they "are highly qualified experts in evaluating Social

18

Security Disability claims"); 20 C.F.R. § 404.1520c(c) (other factors for considering medical opinions include source's "understanding of our disability program's policies and evidentiary requirements").

Finally, I note the ALJ assigned "little weight," but not "no weight" to Dr. Castrilli's opinion, and the ALJ assessed additional limitations in Plaintiff's RFC beyond those opined to by the DDS medical consultants (*see* Tr. 84, Tr. 931, Tr. 909, Tr. 16).

Later in her brief, Plaintiff argues:

> [T]he ALJ's decision rejects the opinions and findings of four physicians, Dr. Langford, Dr. Kadire, Dr. Eckert, and Dr. Castrilli, who opine restrictions regarding the impairments of chronic fatigue, post-traumatic stress disorder, depression, anxiety, panic attacks, pancreatitis, ADHD, IBS, fibromyalgia, migraines, neck pain, back pain, and narcolepsy (R. 24-26)[.] **The ALJ rejects their opinions because there is also evidence in the file showing the Plaintiff is an active participant in her own healthcare with several different providers; she has weaned herself off pain medication at times; she maintains a relationship with her partner and friends; and some of the medical exams in the record show the Claimant to be well-developed and nourished, in no acute distress with normal respiratory findings, normal cardiovascular findings, normal gait and station, normal range of motion, appropriate judgment and insight, and so on.** This was error. The ALJ's analysis bears no meaningful relationship to the impairments at issue (*Id.*).

[Doc. 16 at Page ID # 1088-89 (emphasis added)].

To the extent Plaintiff is referring to the ALJ's consideration of Dr. Castrilli's opinion in this portion of her brief, she is mistaken. In addition to citing the numerous normal exam findings in the record pertaining to Plaintiff's physical and mental state, the ALJ addressed in detail Plaintiff's treatment records from Dr. Castrilli's office which, as discussed above, showed stabilization and then improvement of Plaintiff's gastrointestinal issues. Furthermore, Plaintiff's attempts to downplay the significance of the activities cited by the ALJ fall flat. In particular,

19

Plaintiff's ability to "wean herself" off of prescription pain medicine is significant because it appears that Dr. Castrilli's opinion was based, in part, on the side effects of Plaintiff's medications (Tr. 1026-27).

Plaintiff emphasizes Dr. Castrilli treated "physical as well as emotional symptoms," and he recently recommended Plaintiff get a "service dog as her emotional support animal given her anxiety and depressive disorder." [Doc. 16 at Page ID # 1084 (citing Tr. 1025)]. Plaintiff refers to note in the record from Dr. Castrilli dated July 18, 2022, which provides: "Jennifer Main is a patient under my care. I recommend she have a service dog as her emotional support animal given her anxiety and her depressive disorder." (Tr. 1025). Because this recommendation from Dr. Castrilli does not discuss what Plaintiff can do despite her symptoms or diagnoses, it is not a medical opinion. *See* 20 C.F.R. § 404.1513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions"). Assuming it qualifies as "medical evidence," the ALJ was not required to explain in the written decision how she considered it in assessing Plaintiff's RFC or overall entitlement to benefits. *See Angela H. v. Comm'r of Soc. Sec.*, No. 2:22-cv-4461, 2024 WL 1259875, at *4-5 (S.D. Ohio Jan. 30, 2024) (finding recommendation for emotional support animal did not qualify as a medical opinion and therefore ALJ was not required to "articulate how he considered" it), *report and recommendation adopted*, 2024 WL 1257213 (S.D. Ohio Mar. 25, 2024).

Here, the ALJ did not explicitly mention the service animal recommendation. Nevertheless, it is attached as page one of Dr. Castrilli's April 2021 opinion (Tr. 1026-27), which the ALJ clearly did consider as discussed above. The ALJ addressed other evidence pertaining to Plaintiff's mental functioning and ultimately assessed restrictive mental limitations in Plaintiff's

20

RFC. Plaintiff does not argue Dr. Castrilli's service-animal recommendation would affect Plaintiff's ability to perform mental work-related activities within the assessed RFC, nor does Plaintiff contest the Commissioner's assertion that Plaintiff's records from Dr. Castrilli's office reflect she only rarely brought up mental health concerns to him between November 2019 and June 2022 [Doc. 18 at Page ID # 1112].

Dr. Castrilli opined to extreme limitations the ALJ found unpersuasive. Because the ALJ clearly explained why, the Court may not second guess him. Viewed as a whole, the ALJ's decision demonstrates that she adequately considered the factors of supportability and consistency, in addition to other relevant factors like the treatment relationship, in evaluating Dr. Castrilli's opinion.

This result would not change if the treating physician rule were applied, for essentially the same reasons. The ALJ provided "good reasons" for both her decision not to assign Dr. Castrilli's opinion controlling weight and for her decision to assign the opinion only little weight. *See Biestek*, 880 F.3d at 785; *see also* 20 C.F.R. § 404.1527(c). That is, as the Commissioner points out, the ALJ cites substantial evidence to show "Dr. Castrelli's opinion was not consistent with the overall medical record, which showed that Plaintiff's weight had stabilized; her GI issues were overall well controlled, . . . , and her narcolepsy was overall controlled with medication." [Doc. 18 at Page ID # 1116 (citations and quotation marks omitted)]. As the Commissioner further points out, the numerous normal exam findings cited by the ALJ, the checkmark style format of the opinion/lack of citation to objective findings, and Dr. Castrilli's own treatment notes indicating Plaintiff's pain was controlled with medication all provide further support for the ALJ's decision to assign "little weight" to Dr. Castrilli's restrictive opinion [*see id.* at Page ID # 1117-19]. *See also Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566-67 (6th Cir. 2016) (citing cases that

21

"recognize that the administrative law judge properly gave a check-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence"). Because Plaintiff does not advocate for application of the treating physician rule, I will not belabor the point further. Accordingly, Plaintiff's request for relief should be denied to the extent it is based on any alleged reversible error in the ALJ's consideration of Dr. Castrilli's opinion.

### D. Substantial Evidence

Plaintiff also argues the "ALJ erred by finding the Plaintiff is able to do any work on a regular and sustained basis and the decision is not based on substantial evidence." [Doc. 16 at Page ID # 1085]. This section of Plaintiff's brief raises several issues, all of which appear to relate to Plaintiff's RFC assessed based on all impairments present in November 2019.

Plaintiff suggests the ALJ erred by not finding her narcolepsy, hallucinations, cataplexy, GERD, and essential tremors to be severe impairments [Doc. 16 at Page ID # 1086-87]. As the Commissioner argues, however, so long as one severe ailment is found, any "erroneous finding of non-severity at step two is . . . harmless where the ALJ properly considers nonsevere impairments at later steps." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (citations omitted).

Plaintiff does not seriously contest the ALJ's conclusion that her narcolepsy is well-controlled with medication; rather, she complains the ALJ did not adequately account for hallucinations and cataplexy she continued to experience associated with her narcolepsy and its treatment [*see* Doc. 16 at Page ID # 1086; Doc. 23 at Page ID # 1142]. However, Plaintiff's records from September 2019 indicate she was not experiencing cataplexy (Tr. 662). She did report hallucinations and cataplexy in August 2020 (Tr. 940), and in March 2021 (Tr. 968), as the

22

ALJ acknowledged. However, as the ALJ noted, Plaintiff indicated she did not want to change her medication to address these issues, and by September 2021, these issues were described as "improved" (Tr. 966). Plaintiff's providers noted she was experiencing "no side effects" from her medication (Tr. 966). These same notes were recorded during Plaintiff's March 2022 appointment (Tr. 964).

As for GERD, Plaintiff cites only to records from April 2019, and she does not allege any functional limitations uniquely attributable to GERD as opposed to the other gastrointestinal issues the ALJ addressed at length [*see* Doc. 16 at Page ID # 1086-87]. Similarly, the only evidence Plaintiff cites regarding her essential tremors is a June 2022 record from Roots Counseling Center indicating Plaintiff's "shaking and trembling was reduced by 50% from previous session." [Doc. 16 at Page ID # 1087 (citing Tr. 955)]. By contrast, the ALJ cites numerous exam findings in the record which "do not show any ongoing limitations involving [Plaintiff's] hands" (Tr. 16). Moreover, Plaintiff does not contest the ALJ's finding that the "record also does not contain a valid diagnosis of essential tremors." (Tr. 16).

Disability "is determined by the functional limitations imposed by a condition, not the mere diagnosis of it." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). Plaintiff does not indicate how these alleged conditions affected her ability to function, if at all. I find the ALJ adequately considered these alleged impairments at step two and in assessing Plaintiff's RFC. Plaintiff's argument in this regard should be overruled.

Plaintiff also makes passing arguments regarding the ALJ's consideration of opinion evidence from Tareck Kadrie, M.D., who treated Plaintiff's sleep-related conditions (Tr. 966); Dee Langford, Ed.D., a psychological consultative examiner (Tr. 865); and Dr. Jeff Eckert, Psy.D.,

who treated Plaintiff for about six weeks in June-July of 2022 (Tr. 1029). The ALJ assigned each of these opinions "little weight." (Tr. 20, Tr. 21).

The ALJ properly rejected Dr. Kadrie's note that Plaintiff is "Disabled." (Tr. 966). The ALJ questions whether the note is Dr. Kadrie's opinion or whether Dr. Kadrie was simply "stating what the claimant reports." (Tr. 21). Furthermore, as the ALJ also reasons, whether Plaintiff is "disabled" is a question reserved to the Commissioner, and the ALJ is not required to credit any opinion to that effect. *See Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 827 (E.D. Mich. 2017) ("The ALJ properly discounted Dr. Brennan's opinion. First, she noted that Dr. Brennan's opinion that Plaintiff could not return to work is an issue reserved to the Commissioner and therefore not entitled to special deference." (citations omitted)).

Dr. Langford opined Plaintiff had moderate impairment in her long-term and remote memory functioning; moderate-to-marked impairment in her short-term memory and her ability to sustain concentration; and marked impairment in her ability to socially relate and adapt to change (Tr. 869). The ALJ cited substantial evidence to support her decision to assign Dr. Langford's opinion little weight, including a history of little-to-no mental health treatment, despite a significant history of seeking, obtaining, and managing treatment with multiple different providers for her physical impairments; Plaintiff's ability to wean herself off pain medication once her pancreatitis was under control; and numerous normal exam findings (Tr. 20). Plaintiff's argument – that the ALJ's reasoning is self-contradictory – is not persuasive. The ALJ's reasoning is understandable, adequately articulated, and supported by substantial evidence. I further note Dr. Langford's opinion was offered in August 2019, prior to the significant progress Plaintiff made during the later part of 2019 and into 2020.

24

Dr. Eckert opined Plaintiff "presents severe difficulties in areas of attention, concentration, and processing due to numerous and extreme incidents of physical, psychological, and sexual abuse of a minor perpetrated by family members and others." (Tr. 1029). He further opined Plaintiff "presents with isolation, . . . hyper-vigilance, heightened startle reflex, and difficulty sleeping, with symptoms extending for years and impairing daily functioning." (Tr. 1029). He noted that she "manifests with uncontrollable bodily shakes and difficulty conversing," and "often attempts to crawl into a ball of protection." (Tr. 1029). The ALJ assigned Dr. Eckert's opinion little weight, reasoning that "his conclusions are not consistent with the overall record and appear to rely too heavily on the claimant's allegations," and because Plaintiff had only a short-term relationship with Dr. Eckert, during which time she was primarily seen by a graduate intern working in Dr. Eckert's office (Tr. 21). The ALJ cited numerous records throughout the relevant time of Plaintiff demonstrating "appropriate judgment and insight, intact mental status, clear thought and speech, fully oriented, intact memory, and an appropriate mood and affect." (Tr. 21). Plaintiff does not challenge the ALJ's characterization of this evidence. Rather, she challenges the ALJ's reliance on Plaintiff's short-term relationship with Dr. Eckert, arguing "what is true of Dr. Eckert is also true for all the consultative examiners and medical consultants used by the Social Security Administration." [Doc. 16 at Page ID # 1088].

Again, I am not persuaded the ALJ committed reversible error in her consideration of Dr. Eckert's opinion. For one, the DDS consultants are experts in making social security disability determinations, and they have the benefit of the past medical record (at least through the date they offer their opinion). Nothing about Dr. Eckert's treatment records or opinion indicates Dr. Eckert (or his intern) had similar expertise or access to Plaintiff's past record. Furthermore, even if the ALJ erred in relying in part on the short-term nature of Plaintiff's relationship with Dr. Eckert, she

25

offered other, more significant reasons for discounting his opinion, including its inconsistency with other substantial evidence in the record. *See Jones*, 392 F. Supp. 3d at 839 ("Supportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate.").

For these reasons, I find no reversible error in the ALJ's consideration of the opinion evidence from Dr. Kadrie, Dr. Langford, or Dr. Eckert.[10]

Finally, Plaintiff argues the ALJ mischaracterized her activities of daily living. She argues that none of her "reported activities, or activities attributed to her, were inconsistent with her disability." [Doc. 16 at Page ID # 1089]. She emphasizes her administrative hearing testimony, in which she "indicated she needs help doing essential hygienic activities like bathing and getting dressed, as well as small trips outside her house to allow her small dog to use the restroom" [*Id.*]. She argues "consideration must be given regarding the modifications and help a Plaintiff requires for activities," and she cites several non-binding cases [*Id.*].

The ALJ acknowledged that Plaintiff "reports difficulty performing activities of daily living and ongoing mental health related symptoms." (Tr. 20). As a result – and despite the general

---

[10] As with the ALJ's consideration of Dr. Castrilli's opinion, application of the treating physician rule would not change this result. The evidence cited above provides substantial support for the ALJ's stated reasoning for declining to assign controlling weight to Dr. Eckert's and Dr. Kadrie's opinions as two of Plaintiff's treating providers. Dr. Langford's opinion is not entitled to "any special degree of deference." *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) (citations omitted); *Jagdeo v. Berryhill*, No. 3:17-CV-469-TWP-DCP, 2019 WL 1119363, at *10 (E.D. Tenn. Feb. 19, 2019) (citing *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)), *report and recommendation adopted*, 2019 WL 119642 (E.D. Tenn. Mar. 11, 2019). The evidence and reasoning cited above demonstrate the ALJ properly evaluated Dr. Langford's opinion as a consultative examiner, consistent with SSA rules and policies. *Perry v. Comm'r of Soc. Sec.*, 501 F. App'x 425, 426 (6th Cir. 2012) (citations omitted) (ALJ is not required to "'give good reasons' for the weight he assigns opinions from physicians who . . . have examined but not treated a claimant.").

26

lack of mental health treatment and numerous normal mental status findings in the record, in addition to Plaintiff's apparent ability to actively participate in her healthcare despite her complex illnesses – the ALJ found Plaintiff has "moderate mental health related functional limitation." (Tr. 20). Again, as noted above, this finding reflects greater impairment in mental functioning than found by ALJ Gordon in 2009 or Dr. Rotker in 2014. The ALJ then assessed significant mental functioning limitations in Plaintiff's RFC. Plaintiff's contention that the ALJ exaggerated her activities of daily living, or attributed her ability to work to those activities, is simply without merit, and the cases Plaintiff cites are inapposite.

In considering Plaintiff's ongoing disability status, including her ability to do work on a regular and continuing basis, the ALJ explained the evidence that supports her conclusion, why she considered certain evidence less persuasive, why she found Plaintiff experienced a medical improvement related to her ability to work, and why additional limitations were not included in Plaintiff's RFC up through the date of her decision. The record reflects adequate support for the ALJ's findings and conclusions. *See Schmiedebusch*, 536 F. App'x at 646 ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . ." (citation omitted)).

Because the ALJ had "the enormous task of making sense of the record, reconciling conflicting medical opinions and evidence, and weighing the credibility of [Plaintiff's] subjective complaints," *Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001), judicial review is limited to whether the ALJ relied on evidence that "a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Comm'r of Soc. Sec.*, No. 21-1384, 2022 WL 740692, at *2 (6th Cir. Jan. 4, 2022) (quoting *Biestek*, 139 S. Ct. at 1154). In this case, the record reflects adequate support for the ALJ's findings and conclusions. *See Schmiedebusch*, 536 F. App'x at 646 ("The findings

27

of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . ." (citation omitted)).

## V.  CONCLUSION

For the foregoing reasons, I **RECOMMEND**:[11]

    (1) Plaintiff's request for relief [Doc. 15] be **DENIED**; and

    (2) the Commissioner's request for affirmance of his final decision terminating benefits [Doc. 18] be **GRANTED**.

ENTER:

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[11] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

28